504 F.Supp. 900 (1980)
Rudolph COLEMAN, Plaintiff,
v.
GENERAL MOTORS CORPORATION and United Automobile, Aerospace & Agricultural Implement Workers of America, Local 25, Defendants.
No. 77-1156-C(3).
United States District Court, E. D. Missouri, E. D.
December 3, 1980.
*901 Doris Black, St. Louis, Mo., for plaintiff.
Gerald Kretmar, James E. McDaniel, St. Louis, Mo., for defendants.

MEMORANDUM
FILIPPINE, District Judge.
This is an action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. Plaintiff claims that the defendant General Motors Corporation (GM) has discriminated against him in various ways, including his discharge in November, 1974, because of his race and in retaliation for the fact that he had filed a charge with the Equal Employment Opportunity Commission (EEOC) against GM in February, 1973. Plaintiff also claims that the defendant United Automobile, Aerospace and Agricultural Implement Workers of America, Local No. 25 (Local 25) failed to represent plaintiff properly after his discharge, because of plaintiff's race. After consideration of the pleadings, the testimony of the witnesses and exhibits introduced by the parties at the trial of this matter, the stipulations and the various briefs that have been filed by counsel, the Court makes the following findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52.

FINDINGS OF FACT
Plaintiff is a black male citizen of the United States. He resides in St. Louis County, Missouri. Plaintiff in the past was employed by defendant GM at its automobile assembly plant in St. Louis, Missouri, and was a member of the International Union, United Automobile, Aerospace and *902 Agriculture Implement Workers of America (International Union) and Local 25 thereof. The dates of plaintiff's employment at the General Motors St. Louis Assembly Plant were from October 8, 1962 until November 6, 1974, at which time plaintiff was indefinitely suspended. Said suspension was converted to a discharge on November 8, 1974.
Defendant GM is a Delaware corporation doing business in Missouri. Said corporation is an employer within the meaning of 42 U.S.C. § 2000e(b), in that it is engaged in an industry affecting commerce and employs more than 25 employees.
Defendant Local 25 is a labor organization within the meaning of 42 U.S.C. §§ 2000e(d) and (e) in that said union is engaged in an industry affecting commerce and has at least 25 members.
Starting in November, 1972, plaintiff was the electrical check inspector on the GM plant's second floor, working the first shift. His duties were the same as those of the second shift inspector. In January, 1973, an additional item was added to that position's duties. Plaintiff tried to perform the additional task but could not do it without falling behind. He then refused to do it. Accordingly, on January 10, 1973, he was transferred to the electrical check position in the final process department on the plant's first floor. He immediately filed a grievance charging various management personnel with discrimination in relation to the transfer and another grievance, pursuant to paragraph 78 of the Agreement, charging work overload. Plaintiff's exhibits 46 and 47. His rate of pay and benefits were the same on the first floor as they had been on the second.
However, plaintiff was unhappy in final process because of the automobile fumes there. Therefore, he was moved to left chassis inspection in February, 1973. There, the plaintiff found it too cold and asked to be returned to his original position as electrical inspector on the second floor. When plaintiff agreed that he would do all the tasks of that position, he was returned there in February or March, 1973. When he was returned, four items had been removed from that position's tasks.
On or about February 21, 1973, plaintiff filed a charge of discrimination against GM with the EEOC, Case No. TSL 3-0937 [Stipulation Exhibit 1], alleging numerous forms of racial discrimination. On December 7, 1976, the EEOC notified plaintiff that there was reasonable cause to believe his charges were true but that conciliation efforts had failed and that plaintiff had 90 days in which to file suit [Stipulation Exhibit 2]. Plaintiff did not institute action against GM within 90 days of receipt thereof.
On March 26, 1973 up until May, 1973, the assembly line speed was cut and accordingly, additional jobs were given to various inspectors. Plaintiff did not file any paragraph 78 grievance during this period. Plaintiff's exhibit 26 is a list of duties that includes some of the additions from this period. Plaintiff attempted to show that Robert Schuff, who had the second shift of plaintiff's position did not do all of these items. However, plaintiff did not establish that Schuff still held that position in March, 1973, so the fact that Schuff could not remember performing all the tasks on plaintiff's exhibit 26 is irrelevant.
In May, 1973, plaintiff received a reprimand for being late for work. He filed a grievance and the reprimand was later removed.
In September, 1973, plaintiff received a reprimand (plaintiff's exhibit 41) because he left the line to go to the bathroom before a relief man had arrived, and missed two jobs as a result. He filed a grievance (plaintiff's exhibit 43) and the reprimand was later removed and he was paid for the time he had been forced to take off.
At all times referred to in plaintiff's complaint there were Shop Rules for personal conduct (Stipulation Exhibit 10) which applied to plaintiff and all other hourly-rated employees of the General Motors Assembly Division St. Louis Plant. The Shop Rules indicated that any of the enumerated acts "[would] be sufficient grounds for disciplinary action ranging from reprimand to immediate discharge," and Number 30 read "Fighting on the premises at any time."
*903 Sometime in mid-1974, Sylvester Leon Mitchell, who is black, began working alongside the plaintiff. Working relations between the two men were not always amicable. On November 5, 1974, plaintiff and Mitchell had a brief verbal altercation when Mitchell somehow worked his way into what plaintiff considered to be the plaintiff's work area. Plaintiff asked the "rover" to call the foreman, but as it was near the end of the shift, plaintiff agreed to wait until the next day.
On November 6, the next day, plaintiff accosted Mitchell on the job, saying "This is it." A scuffle ensued. It was broken up after a few blows had been exchanged. Plaintiff's job was taken over for approximately 30 minutes by the "rover" and plaintiff left.
When plaintiff returned, Mitchell was working in an automobile, with his legs hanging out the open door. Mitchell heard someone yell "Look out." The plaintiff had approached, and, attempting to shut the car door on Mitchell's legs, reached in and stabbed Mitchell in the back with plaintiff's scratch awl. (A scratch awl (GM's exhibit Q) resembles an ice pick). Mitchell managed to kick the door back open, causing it to hit plaintiff in the face, and jumped out of the car. Mitchell then ran down the aisle and plaintiff, scratch awl in hand, pursued him. Mitchell yelled that plaintiff had a knife. Plaintiff's pursuit was interrupted by the foreman, Butch Vollmer.
Vollmer escorted plaintiff to the inspectors' office and left plaintiff there while he went back to check on Mitchell. After seeing Mitchell's back, Vollmer gave him permission to go to the medical dispensary. At the dispensary, Mitchell was examined by a doctor. The case record made at the time (GM's exhibit P) indicated that Mitchell had a superficial puncture wound or abrasion in the left mid-paradorsal spine area with a linear superficial abrasion extending from that lesion. Mitchell also had small areas of skin excoriations on his right forearm, one of which might have been a puncture wound.
Vollmer then took statements from certain employees who had witnessed the incident (or parts of it) between plaintiff and Mitchell. These included Gerald Frey, Jim Wolff, Raymond Baker, and Lou Gerschefske. In the meanwhile, a disciplinary interview of the plaintiff had begun. It was conducted by Gene Robinson, who was then the labor relations representative for GM. When plaintiff was informed that there was to be a disciplinary interview, plaintiff requested that his committeeman be present. As the regular committeeman was off sick that day, the alternate Billy Goodman was called. He and the plaintiff discussed the situation for approximately an hour. Plaintiff insisted that Mitchell had had a knife. Goodman and another committeeman, Lynn Woodward, who later talked to Mitchell, agreed that if plaintiff or Mitchell mentioned weapons, both men might lose their jobs. Plaintiff agreed to represent the incident as a minor scuffle.
The disciplinary interview resumed.[1] In the course of the interview, however, plaintiff repeated that Mitchell had had a knife and that plaintiff picked up the scratch awl in self-defense. Plaintiff admitted that he pursued Mitchell with the scratch awl. At the conclusion of the interview, plaintiff was placed on indefinite suspension. He was given written notice of the suspension (plaintiff's exhibit 42).
Mitchell was also given a disciplinary interview, at which zone committeeman Woodward was present. Mitchell also was placed on indefinite suspension, but he was later returned to work and the suspension was removed from his record.
After receiving the notice of suspension, plaintiff again conferred with Goodman and asked him to file a grievance on his behalf concerning the suspension. Goodman did so (plaintiff's exhibit 39). Plaintiff then left the plant. The grievance was denied by foreman Vollmer.
The National Agreement (Agreement) between General Motors Corporation and *904 the International Union, effective December 10, 1973, (Stipulation Exhibit 9), was in full force and effect at the time of plaintiff's indefinite suspension on November 6, 1974, and his discharge on November 8, 1974. Plaintiff, GM, the International Union, and Local 25 as a local affiliate of the International Union were bound by the provisions of said Agreement. Paragraph 76(a) of the Agreement provides that when suspension of an employee is contemplated, the employee is normally to be offered an interview to answer the charges against him. Plaintiff's interview was conducted in accordance with that provision, and plaintiff had been so informed.
Pursuant to Paragraph 8 of the National Agreement, defendant GM has the sole right to hire, promote, discharge or discipline for cause each and every employee covered by the Agreement.
On November 7, 1974, plaintiff filed a charge of discrimination against GM with the EEOC, Case No. TSL 5-0896 [Stipulation Exhibit 3], charging that he had been harassed and laid off because of his race and in retaliation for the EEOC charge he had filed in January, 1973.[2]
On November 8, 1974, GM sent plaintiff a certified letter (plaintiff's exhibit 38), signed by G. P. Boyer, Supervisor of Labor Relations at the Plant, indicating that plaintiff's suspension was being converted to a discharge for his actions "when, involved in a fight with Employe S. L. Mitchell, you attacked him with a weapon which you admitted was a scratch awl." The letter advised the plaintiff that he had the right to be represented in the matter by his committeeman.
Although Shop Rule 30 does not specify that fighting with a weapon results automatically in a discharge, the understanding of other GM employees who testified at trial is that this is the case. There is GM-International Union arbitral precedent to that effect. Even if there were no completely hard and fast rule that fighting with weapons results in discharge, the disruptive effect of one employee stabbing another with a scratch awl and chasing the other through the plant would certainly provide good cause for discharge.
Plaintiff introduced evidence that a white GM foreman, Bill Crisco, had once hit a black employee, Kevin Iverson, pushing him backward, and that no discipline was assessed against the foreman. However, there was no evidence that a weapon was involved in that incident. Plaintiff also introduced evidence that in April, 1979, a black GM employee, Edward Cameron, was hit in the head with a metal chair by a fellow employee, John Sharp, who is white. Sharp was not disciplined. There was also testimony concerning a fistfight in which one white employee hit another white employee with a wooden tool box and no discipline resulted. However, plaintiff simply did not establish that these incidents were of the same aggravated character as that in which plaintiff and Mitchell were involved.
After the plaintiff's disciplinary interview, Goodman interviewed several of the employees who had witnessed the incident, including Wolff, Frey, and Baker. The defendant Local 25 processed the plaintiff's grievance protesting his suspension and discharge[3] through the first two steps of the grievance procedure and then appealed same to the International Union, in accordance with Paragraphs 37 through 42 of the Agreement.
On November 12, 1974, Goodman took the grievance to the "step-and-a-half" level, Agreement, Paragraph 30. It was denied at that level by general foreman Bob Carter. Goodman then took an appeal to the Shop Committee, where it was assigned to *905 zone committeeman Woodward. Woodward conducted an investigation and talked to several employees, including Wolff, Baker, and Frey. The grievance was denied by G. P. Boyer, GM Labor Relations Representative, on November 18, 1974, after a "Paragraph 77" meeting, which is the equivalent of the Step Two procedures set forth in Paragraphs 31-36 of the Agreement.
Woodward then met informally with Boyer in an attempt to settle the grievance. Woodward, in an attempt to allay Boyer's concern that plaintiff, if reinstated, might cause harm to someone else, suggested that plaintiff be sent to a psychiatrist of plaintiff's choice for a study. If the study showed that plaintiff was non-violent, then, Woodward argued, he should be reinstated. Boyer, after some consideration, agreed with Woodward's proposal. The plaintiff, however, responded that he would not plead insanity, and he refused to cooperate with the settlement proposal.
After plaintiff rejected the proposal, Woodward prepared a Notice of Unadjusted Grievance (Local 25's exhibit D), as required by paragraph 37 of the Agreement for an appeal to the Third Step. Woodward also prepared and submitted (for signature by James Blancett) the Statement of Unadjusted Grievance (plaintiff's exhibit 17). That Statement reflected the fact that Woodward was representing both plaintiff and Mitchell with the company and was attempting to put both in the best possible light. Woodward did not want to mention any weapons in the Statement, and he denied that any weapons had been used, but he did write that plaintiff had a "tool" in his hand when Vollmer saw him.
Pursuant to Paragraph 38 of the Agreement, copies of the Statements of Unadjusted Grievance of Local 25 and GM were sent to C. E. Mattix, then Regional Representative for the International Union. Mattix decided to appeal the plaintiff's case and arranged a Third Step grievance meeting with GM, at which plaintiff's and other cases were discussed. The meeting took place in January of 1975. Mattix argued for plaintiff's reinstatement but GM management refused because the plaintiff had used a weapon in the fight. GM prepared a written statement of its decision denying plaintiff's grievance (GM's exhibit N) in accordance with Paragraph 42 of the Agreement. Thereafter, Mattix prepared a Notice of Appeal to Umpire (GM's exhibit O), in accordance with paragraph 43 of the Agreement.
On April 30, 1975, plaintiff filed a charge of discrimination with the EEOC against Local 25, Case No. TSL 5-1768, (Stipulation Exhibit 6) alleging that Local 25 was not properly representing him because of his race.[4]
In May, 1975, Bud Lawley, from the International Union, conducted an investigation of the plaintiff's case. He talked at length to plaintiff and to various employees who had witnessed the incident. There was no evidence, except plaintiff's testimony, that Mitchell had had a knife. Lawley concluded that it would be impossible to show that plaintiff had acted in self-defense because plaintiff had chased Mitchell. Accordingly, on or about June 12, 1975, Lawley withdrew the plaintiff's grievance, Case P-551, from the Umpire's consideration, without prejudice (as shown on Stipulation Exhibit 11).
Pursuant to Article 33 of the UAW Constitution (Local 25's exhibit TT), pages 62 through 65, plaintiff appealed the withdrawal of said grievance by the International Union. By letter dated November 7, 1975, plaintiff was notified by George Merrelli, Director of Region 1 of the International Union and Chairman of the International Appeals Committee for Region 5 of the International Union, that a hearing on his appeal was to be held on Tuesday, November *906 25, 1975 at 11:00 a. m. at the Executive International Inn in Bridgeton, Missouri (Local 25's exhibit R).
At a Local 25 meeting held on November 13, 1975, plaintiff appeared and asked members to sign petitions for the return of plaintiff's job to him. See plaintiff's exhibit 10. At that part of the meeting for the first shift, plaintiff claimed that James Blancett, Chairman of the Shop Committee, had called plaintiff a "stupid s.o.b.," and plaintiff objected to the way Blancett had talked to him about plaintiff's grievance. Blancett, who was present, called for a point of order and stated that plaintiff had signed the disciplinary interview and that he, Blancett, didn't know of anyone who would allow stabbing on the job. Woodward, then President of Local 25, called for order and said that because plaintiff had an appeal pending, no further discussion was appropriate.
On November 25, 1975, the hearing on plaintiff's appeal was held as scheduled. Plaintiff was present and represented by private counsel at the hearing. Thereafter, the Appeals Committee, assigned by the International Executive Board (IEB) of the International Union to hear the appeal, issued its report (Stipulation Exhibit 13) to the IEB and recommended therein that plaintiff's appeal be denied. Said recommendation was adopted by the IEB (Stipulation Exhibit 14).
Pursuant to Section 8 of Article 33 of the UAW Constitution, plaintiff appealed the decision of the IEB to the Public Review Board (PRB) of the International Union, established under Article 32 of the UAW Constitution. On March 31, 1977, the PRB issued its decision denying plaintiff's appeal (Stipulation Exhibit 15).

CONCLUSIONS OF LAW
The Court has jurisdiction of this action pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1343.
Plaintiff's claims against both defendants under Title VII and 42 U.S.C. § 1981 are based on the allegations of disparate treatment because of his race. In Kirby v. Colony Furniture Company, Inc., 613 F.2d 696, 703 (8th Cir. 1980), the Eighth Circuit said: "[i]n a disparate treatment case the Title VII plaintiff must show `actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a discriminatory criterion illegal under the Act."'" (Citations omitted).
Plaintiff's claim that GM discriminated against him by discharging him is without merit. He was discharged for a valid, non-discriminatory cause. Plaintiff's evidence that other GM employees engaged in fights without being discharged does not establish racially discriminatory treatment because those fights either did not involve weapons, or were simply not shown to be of the same character as plaintiff's attack on Mitchell. The Court agrees with the view expressed in Cofer v. Mack Trucks, Inc., No. 79-8 C (2) (E.D.Mo., November 13, 1980), that plaintiff need not show that other employees had committed the exact same offense as plaintiff but were disciplined differently or not at all, in order to establish disparate treatment. However, the Court simply cannot find that a fight, even if it did include one blow with a toolbox or a chair, was of the same degree of seriousness as that in which plaintiff was involved. Accordingly, the Court rejects plaintiff's claim of disparate treatment by GM in plaintiff's discharge.
Moreover, the Court has found no persuasive evidence of disparate treatment by GM in other respects. There was no evidence of disparate working conditions or salaries. While plaintiff attempted to show that he was required to do more tasks than was the second-shift man on plaintiff's position, the proof was extremely confused and the Court simply is not persuaded that plaintiff was required to do tasks that the second-shift man was not required to do at the same time. Accordingly, plaintiff may not prevail on that issue. Nor can the Court conclude that simply because plaintiff was disciplined twice after he filed the EEOC charge in February, 1973, and before *907 he was discharged in November, 1974, and because the discipline was later removed, that GM was harassing plaintiff in retaliation for having filed the charge. Nor was there any persuasive evidence that Mitchell was a troublemaker who had been placed next to plaintiff by GM to provoke plaintiff into a fight.
Turning to plaintiff's claims against Local 25, the Court observes that plaintiff has not made a claim of breach of duty of fair representation under 29 U.S.C. § 185. Rather, plaintiff's claims against Local 25 are based on racial discrimination. The Court simply has found no evidence of such. The evidence was, in fact, that Local 25 had satisfactorily represented the plaintiff on a number of occasions prior to his suspension and discharge in November, 1974. While Goodman and Woodward might have attempted to persuade plaintiff not to say that Mitchell had a knife, and made no mention of a knife in the Statement of Unadjusted Grievance, this was done not only because Local 25 was representing both men and wanted to put both in the best possible light, but also because none of the other witnesses saw a knife on Mitchell. Moreover, because Mitchell is also black, the Court cannot draw any inference that Local 25 officials tried to downplay the seriousness of Mitchell's actions to put the plaintiff in a bad light simply because plaintiff is black. The Court finds no evidence of racial discrimination in the events at the Local 25 meeting in November, 1975. Local 25 fully and fairly processed the plaintiff's grievance and even had a reasonable settlement arranged for plaintiff, but plaintiff rejected its terms.
Accordingly, judgment will be entered in favor of both defendants in this action. Local 25 has requested an award of attorney's fees in its answer to plaintiff's complaint. The Court will allow Local 25 ten days from the date of entry of this judgment to file a motion for attorney's fees. Plaintiff will have ten days to file a response thereto.
NOTES
[1] Robinson made verbatim notes of his questions and answers. Plaintiff signed each page of the notes after the interview. GM's exhibit X.
[2] On or about August 28, 1976, plaintiff filed another charge of discrimination, this one concerning his discharge, against GM with the EEOC which also was assigned Case No. TSL 5-0896 (Stipulation Exhibit 4). On or about August 3, 1977, plaintiff, at his request, was issued a notice of right to sue letter (Stipulation Exhibit 5). Plaintiff filed the instant action on October 31, 1977, within 90 days of his receipt of the notice of right to sue letter.
[3] A second grievance was not necessary when the suspension was converted to a discharge.
[4] On August 28, 1976, plaintiff filed another charge of discrimination against Local 25 with the EEOC which also was assigned Case No. TSL 5-1768 (Stipulation Exhibit 7). On or about August 3, 1977, the EEOC issued plaintiff, on plaintiff's request, a notice of right to sue (Stipulation Exhibit 8). As noted above, the instant action was commenced on October 31, 1977.